Slip Op. 18-69

## UNITED STATES COURT OF INTERNATIONAL TRADE

DANZE, INC.,

               Plaintiff,

     v.

THE UNITED STATES,

               Defendant.

Before: Mark A. Barnett, Judge

Court No. 13-00381

OPINION

[The court finds that U.S. Customs and Border Protection correctly classified the subject imports.  Accordingly, the court denies Plaintiff's motion for summary judgment and grants Defendant's cross-motion for summary judgment.]

Dated:  June 19, 2018

John M. Peterson and Richard F. O'Neill, Neville Peterson LLP, of New York, NY, for Plaintiff Danze, Inc.

Edward F. Kenny, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for Defendant United States. With him on the brief were Chad A. Readler, Acting Assistant Attorney General, and Amy M. Rubin, Assistant Director, International Trade Field Office. Of counsel on the brief was Sheryl A. French, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

      Barnett, Judge:  This action addresses whether various models of vitreous china toilets and a particular toilet tank are "specially designed for the use or benefit of handicapped persons" and are therefore entitled to duty-free treatment under subsection 9817.00.96 of the Harmonized Tariff Schedule of the United States

("HTSUS").[1]  Before the court are cross-motions for summary judgment.  Pl.'s Mot. for

Summ. J., ECF No. 34; Mem. in Supp. of Pl.'s Mot. for Summ. J ("Pl.'s Mem."), ECF No.

34-2; Def.'s Cross-Mot. for Summ. J. and Mem. in Opp'n to Pl.'s Mot. for Summ. J. and

in Supp. of Def.'s Cross-Mot. for Summ. J. ("Def.'s Mem."), ECF No. 39.  Plaintiff,

Danze Inc. ("Plaintiff" or "Danze"), contends that the subject merchandise is classifiable

under subheading 9817.00.96 because the products were specially designed to meet

the requirements of the Americans with Disabilities Act of 1990, Pub. L. No. 101-336,

104 Stat. 327 (1990) (codified at 42 U.S.C. §§ 12101-12213).  *See, e.g.*, Pl.'s Mem. at

1, 4-5.[2]  The United States ("Defendant" or the "Government") maintains that mere

compliance with ADA standards does not render the merchandise classifiable under

subheading 9817.00.96.  *See, e.g.*, Def.'s Mem. at 6.  The Government asserts that

U.S. Customs and Border Protection ("Customs") correctly classified the merchandise

under subheading 6910.10.00, HTSUS.  *Id.* at 21.  For the reasons discussed below,

the court denies Plaintiff's motion for summary judgment and grants Defendant's cross-

motion for summary judgment.

---

[1] All citations to the HTSUS are to the 2011 and 2012 versions, which are identical in all relevant respects, as determined by the date of importation of the merchandise.  *See LeMans Corp. v. United States*, 660 F.3d 1311, 1314 n.2 (Fed. Cir. 2011).  The subject merchandise entered on various dates between December 2011 and March 2012.  Pl.'s Statement of Material Facts as to which No Genuine Issue Exists ("Pl.'s SOF") ¶¶ 1, 3, ECF No. 35; Def.'s Resp. to Pl.'s Statement of Material Facts Not in Issue ("Def.'s Resp. to Pl.'s SOF") ¶¶ 1, 3, ECF No. 40.

[2] Four entries are at issue: Entry Numbers MR5-40440556, MR5-40454474, MR5-40448468, MR5-40461883.  Pl.'s Am. Ex. A (Entry Documents), ECF No. 43.

## BACKGROUND

### I.   Material Facts Not in Dispute

The party moving for summary judgment must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." United States Court of International Trade ("USCIT") Rule 56(a).  Parties filed cross-motions for summary judgment and submitted separate statements of undisputed material facts with their respective motions and responses to the opposing party's statements.  *See* Pl.'s SOF; Def.'s Resp. to Pl.'s SOF; Def.'s Statement of Undisputed Material Facts ("Def.'s SOF"), ECF No. 39-1; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ("Pl.'s Resp. to Def.'s SOF"), ECF No. 44-1.  Upon review of the parties' facts (and supporting exhibits), the court finds the following undisputed and material facts.[3]

Danze is a designer and distributor of kitchen and bath faucets and fixtures, and designed the subject merchandise.  Def.'s SOF ¶¶ 6, 10; Pl.'s Resp. to Def.'s SOF ¶¶ 6, 10.  The subject merchandise consists of four models of vitreous china[4] toilets[5]

---

[3] Citations are provided to the relevant paragraph number of the undisputed facts and response; internal citations generally have been omitted.

[4] Vitreous china is "a hard-fired ceramic ware that has a dense, vitrified, but opaque body, and is used esp. for plumbing fixtures."  Webster's Third New Int'l Dictionary of the English Language Unabridged (2002) ("Webster's") at 2559.

[5] The term "toilet" refers to both two-piece toilets, which consist of a separate tank and toilet bowl, and one-piece toilets, which includes the toilet tank and bowl designed as a single unit.  *See* Pl.'s Exs. C-1—C-5 (product information for the subject merchandise), ECF No. 36-3.  A "toilet bowl" is "the portion of the toilet that is round or oval and open at the top and can be flushed with water."  Pl.'s SOF ¶ 17; Def.'s Resp. to Pl.'s SOF ¶ 17.  A "toilet tank" is "the part of the toilet that is a cistern tank for storing water used to flush the toilet."  Pl.'s SOF ¶ 17; Def.'s Resp. to Pl.'s SOF ¶ 17.  Of the four toilets at

and one vitreous china toilet tank manufactured in the People's Republic of China and imported into the United States between December 2011 and March 2012.  Pl.'s SOF ¶¶ 1-3; Def.'s Resp. to Pl.'s SOF ¶¶ 1-3.  The toilets at issue are the: 1) Orrington 1 Piece High Efficiency Toilet ("HET"), Model No. DC011323; 2) Cirtangular 2 Piece HET, Model No. DC023330-DC022321; 3) Cobalt 1 Piece HET, Model No. DC061421; and 4) Ziga Zaga 1 Piece HET, Model No. DC031221.  Def.'s SOF ¶ 2; Pl.'s Resp. to Def.'s SOF ¶ 2.  The toilet tank at issue is the Orrington Toilet Tank, Model No. DC012223. Def.'s SOF ¶ 3; Pl.'s Resp. to Def.'s SOF ¶ 3.

Danze intentionally designed the subject merchandise to have characteristics— such as specific dimensional properties and design, including the location and performance of operable parts—that contribute to merchandise functionality.  Pl.'s SOF ¶ 11; Def.'s Resp. to Pl.'s SOF ¶ 11.  According to the National Consensus Standards for Vitreous China Plumbing Fixtures, adult water closets must have a minimum toilet bowl "rim height" of 13 1/2 inches.  Pl.'s SOF ¶ 12; Def.'s Resp. to Pl.'s SOF ¶ 12.  The toilet bowls here have a "rim height" measuring at least 16 1/2 inches from the finished floor to the bowl rim after installation.[6]  Pl.'s SOF ¶¶ 14-15; Def.'s Resp. to Pl.'s SOF ¶¶ 14-15.  Specifically, the Cobalt measures 16 7/8 inches from the finished floor to the

---

issue, three models are one-piece, while one model is a two-piece toilet.  *See* Pl.'s Ex. C-1—C-5.

[6] "The toilet bowl 'rim' refers to the top front edge of the toilet bowl, and 'rim height' refers to a measurement taken from the base floor to the toilet bowl's uppermost front edge."  Pl.'s Mem. at 2 n.4.  "The 'rim height' excludes the thickness of the toilet seat and toilet seat cover."  Pl.'s SOF ¶ 14; Def.'s Resp. to Pl.'s SOF ¶ 14.

bowl rim; the remaining three toilets measure 16 1/2 inches for the same distance.

Def.'s SOF ¶ 13; Pl.'s Resp. to Def.'s SOF ¶ 13.[7]

Danze's product information documents for each toilet state that the toilet package includes the toilet seat, which is to be installed separately.  *See* Pl.'s Ex. C-1—C-5 at Bates 257, 235, 283, 303 ("Description") and Bates 237, 259-260, 285, 305-306 ("Before Installation").  The information documents setting forth the product dimensions do not specify the seat height.[8]  *See*, *e.g.*, Pl.'s Ex. C-1 at Bates 235 (including measurements for overall height, length, and width; tank width and length; and rim height, but no measurement for seat height).  While the specific toilet models were unavailable,[9] a measurement of two similar models revealed that after installation of the seat, the height from the finished floor to the top of the toilet seat was at least 17 inches. Pl.'s SOF ¶¶ 51, 55; Def.'s Resp. to Pl.'s SOF ¶¶ 51, 55; Pl.'s Ex. H (Dep. Tr. of Thomas Kevin McJoynt) at 86:18-87:18, ECF No. 36-9; Pl.'s Ex. D (Decl. of T. Kevin McJoynt) ¶¶ 7-8, 10, 13 & Exs. A-C (photographs), ECF No. 36-4.  The subject toilets were imported into the United States with a seat included.  Pl.'s Ex. H at 126:3-15.

---

[7] Indeed, all of the toilets that Danze markets measure, at minimum, 16 1/2 inches from the finished floor to the bowl rim.  Def.'s SOF ¶ 14; Pl.'s Resp. to Def.'s SOF ¶ 14.

[8] "Seat height" refers to the distance between the uppermost surface on which a user sits when using the toilet and the finished floor.  Pl.'s SOF ¶ 19; Def.'s Resp. to Pl's SOF ¶ 19.  The seat height excludes the "toilet seat cover" that may be installed to cover the toilet seat when it is not in use.  Pl.'s SOF ¶ 19; Def.'s Resp. to Pl's SOF ¶ 19.

[9] Danze discontinued the subject merchandise and thus was unable to produce actual samples of any of the complete toilets nor their corresponding toilet seats or seat specifications.  Pl.'s Ex. D ¶ 6; Def.'s SOF ¶ 24; Pl.'s Resp. to Def.'s SOF ¶ 24.  Danze was only able to produce an identical sample of the toilet tank.  Pl.'s Ex. D ¶ 7.

None of the imported toilets includes a toilet seat that springs to return to a lifted

position.  Pl.'s SOF ¶ 21; Def.'s Resp. to Pl.'s SOF ¶ 21; Pl.'s Ex. H at 126:3-15.

        The toilets and tank have the flush control on the outside of the tank, connected

to a lever arm on the inside of the tank, which is attached by a thin chain to a three-inch

round rubber flapper valve at the bottom of the tank.  Def.'s SOF ¶ 17; Pl.'s Resp. to

Def.'s SOF ¶ 17.  The flush controls are positioned less than 36 inches above the

finished floor and can be operated by one hand with a force not exceeding five pounds.

Pl.'s SOF ¶¶ 23-25, 27; Def.'s Resp. to Pl.'s SOF ¶¶ 23-25, 27.  The flush controls do

not require "a user to tightly grasp, pinch or twist their wrist" in order to flush. Pl.'s SOF

¶ 26; Def.'s Resp. to Pl.'s SOF ¶ 26.  The flush control "for all of the toilets . . . are only

available in left side mount configurations, as viewed from the perspective of a person

facing the toilet tank."  Def.'s SOF ¶ 16; Pl.'s Resp. to Def.'s SOF ¶ 16.

        Toilet bowls usually possess either a round or elongated (oval) shape.  Def.'s

SOF ¶ 19; Pl.'s Resp. to Def.'s SOF ¶ 19.  Toilets with a round bowl typically protrude a

maximum of 28 inches from the finished wall, conserving space in a smaller bathroom.

Def.'s SOF ¶ 20; Pl.'s Resp. to Def.'s SOF ¶ 20.  Toilets with an elongated bowl typically

protrude up to 31 inches from the finished wall, thus occupying more space than a

round toilet bowl.  Def.'s SOF ¶ 22; Pl.'s Resp. to Def.'s SOF ¶ 22.  An elongated bowl,

however, is more comfortable for users.  Def.'s SOF ¶ 21; Pl.'s Resp. to Def.'s SOF

¶ 21.  The subject toilets "feature an elongated oval bowl shape but have a more

compact overall footprint."  Def.'s SOF ¶ 11; Pl.'s Resp. to Def.'s SOF ¶ 11.  A 2008

internal Danze memorandum states that the company's decision to develop a line of

high efficiency compact elongated toilets arose from "[t]he demands . . . from geographic areas where the bathrooms are typically small.  By reducing the foot print and maintaining the flushing performance, we are able to provide great aesthetic solutions to our customers."  Pl.'s Ex. F-1 (Aug. 25, 2008 Danze Project Mem.) at Bates 667, ECF No. 36-7; Pl.'s Ex. H at 99.  This same memorandum specifies that the products must be ADA-compliant.  Pl.'s Ex. F-1 at 668.

Danze sells the subject merchandise "through national, regional, and local plumbing retailers and contractors."   Def.'s SOF ¶ 8; Pl.'s Resp. to Def.'s SOF ¶ 8.  The product information on each model states that it meets the ADA Accessibility Guidelines for Buildings and Facilities.  Pl.'s SOF ¶ 22; Def.'s Resp. to Pl.'s SOF ¶ 22.  Moreover, Danze's website, the product packaging, and third-party sellers describe the subject toilets as ADA compliant.  Pl.'s SOF ¶¶ 31-33; Def.'s Resp. to Pl.'s SOF ¶¶ 31-33; *see also* Pl.'s SOF ¶ 65; Def.'s Resp. to Pl.'s SOF ¶ 65.  The toilet tank at issue may only be installed with a specific toilet bowl, which Danze's product information indicates is ADA compliant.  Pl.'s SOF ¶¶ 62-63; Def.'s Resp. to Pl.'s SOF ¶¶ 62-63.[10]

Danze describes its toilets, including the subject toilets as "ergonomically designed at a level that makes sitting and standing more comfortable for any age group."  Def.'s SOF ¶¶ 15, 23; Pl.'s Resp. to Def.'s SOF ¶¶ 15, 23; Pl. Ex. E-1 (Danze

---

[10] While the Defendant does not dispute this fact, it avers that the citation provided by Danze does not support the statement.  Def.'s Resp. to Pl.'s SOF ¶¶ 62.  It appears to the court that Danze mis-cited the supporting pages of the McJoynt deposition, citing pages 90-93 when they should have cited pages 80-83.  *See* Pl.'s Ex. H at 80-83.  In any case, Defendant acknowledges that any dispute with respect to this statement is not material.

Catalog) at Bates 515, ECF No. 36-5.  Its product catalog describes Danze's design philosophy "for all products as that of 'Universal Design.'"  Def.'s SOF ¶ 27; Pl.'s Resp. to Def.'s SOF ¶ 27; Pl. Ex. E-1 at Bates 515.  On its website, Danze states: "Our high efficiency toilets conform to universal design standards and give you all those little touches . . . whether it be great flushing power, a perfect height, elongated bowl or slow closed lids[.]"  Def.'s SOF ¶ 28; Pl.'s Resp. to Def.'s SOF ¶ 28 (alteration omitted).

Danze does not maintain any data showing the percentage of end users, with or without physical handicaps, of the imported merchandise.  Def.'s SOF ¶ 26; Pl.'s Resp. to Def.'s SOF ¶ 26.

## II.   Procedural History

Danze entered the merchandise pursuant to subheading 6910.10.00, HTSUS,[11] dutiable at 5.8 percent *ad valorem,* at the port of Chicago, Illinois.  Pl.'s SOF ¶ 4; Def.'s Resp. to Pl.'s SOF ¶ 4.  Thereafter, Danze timely and properly protested the liquidation of these entries, claiming that the merchandise is secondarily classifiable pursuant to subheading 9817.00.96. Pl.'s SOF ¶ 6; Def.'s Resp. to Pl.'s SOF ¶ 6.  Customs denied Danze's protests in full, stating, "Per attached product specifications, all models contain a floor to rim height less than 17 inches, no specific information provided on seat size, and design, etc."  Pl.'s Ex. A at Bates 004.  Danze challenges the denial of its protests.

---

[11] Subheading 6910.10.00 covers: "Ceramic sinks, washbasins, washbasin pedestals, baths, bidets, water closet bowls, flush tanks, urinals and similar sanitary fixtures: Of porcelain or china," and has a duty rate of 5.8 percent *ad valorem*.

### JURISDICTION AND STANDARD OF REVIEW

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(a).

Jurisdiction is uncontroverted.  Compl. ¶ 2, ECF No. 10; Answer ¶ 2, ECF No. 17.

The Court may grant summary judgment when "there is no genuine issue as to

any material fact," and "the moving party is entitled to judgment as a matter of law."

*Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986); USCIT Rule 56(a).[12]  The court's

review of a classification decision involves two steps.  First, it must determine the

meaning of the relevant tariff provisions, which is a question of law.  *See Bausch &*

*Lomb, Inc. v. United States*, 148 F.3d 1363, 1365 (Fed. Cir. 1998) (citation omitted).

Second, it must determine whether the merchandise at issue falls within a particular

tariff provision, as construed, which is a question of fact.  *Id.* (citation omitted).  When no

factual dispute exists regarding the merchandise, resolution of the classification turns

solely on the first step.  *See id.* at 1365–66; *see also Carl Zeiss, Inc. v. United States*,

195 F.3d 1375, 1378 (Fed. Cir. 1999).

The court reviews classification cases *de novo*.  *See* 28 U.S.C. § 2640(a).  While

the court accords deference to Customs classification rulings relative to their "power to

persuade," *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) (quoting *Skidmore v.*

*Swift & Co.*, 323 U.S. 134, 140 (1944)), it has "an independent responsibility to decide

---

[12] When parties have filed cross-motions for summary judgment, the court generally
must evaluate each party's motion on its own merits, drawing all reasonable inferences
against the party whose motion is under consideration. *JVC Co. of America, Div. of US
JVC Corp. v. United States*, 234 F.3d 1348, 1351 (Fed. Cir. 2000); *Specialty
Commodities Inc. v. United States*, 40 CIT ___, ___, 19 F. Supp. 3d 1277, 1282 (2016).
Here, the material facts are undisputed.

the legal issue of the proper meaning and scope of HTSUS terms," *Jedwards Int'l, Inc.*

*v. United States*, 40 CIT ___, ___, 161 F. Supp. 3d 1354, 1357 (2016) (quoting

*WarnerLambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005)).  It is "the

court's duty to find the correct result, by whatever procedure is best suited to the case at

hand." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir. 1984).

**DISCUSSION**

### I.  **Legal Framework**

The General Rules of Interpretation ("GRIs") provide the analytical framework for

the court's classification of goods.  *See N. Am. Processing Co. v. United State*s, 236

F.3d 695, 698 (Fed. Cir. 2001).  "The HTSUS is designed so that most classification

questions can be answered by GRI 1."  *Telebrands Corp. v. United States*, 36 CIT ___,

___, 865 F. Supp. 2d 1277, 1280 (2012), *aff'd* 522 F. App'x 915 (Fed. Cir. 2013).  GRI 1

states that, "for legal purposes, classification shall be determined according to the terms

of the headings and any [relevant] section or chapter notes."  GRI 1, HTSUS.  "The first

four digits of an HTSUS provision constitute the heading, whereas the remaining digits

reflect subheadings."  *Schlumberger Tech. Corp. v. United States*, 845 F.3d 1158, 1163

n.4 (Fed. Cir. 2017).  Relevant here,[13] "the classification of goods in the subheadings of

---

[13] In the present case, the parties agree that the articles at issue were properly classified pursuant to subheading 6910.10.00, HTSUS.  Pl.'s Mem. at 4; Def.'s Mem. at 8.  The sole issue is whether the subject merchandise is secondarily classifiable in subheading 9817.00.96, HTSUS.  Pl.'s Mem. at 4; Def.'s Mem. at 8.  "Chapter 98 does not contain four-digit headings, but rather, is a collection of eight- or ten-digit subheadings covering a diverse array of articles."  *WWRD U.S., LLC v. United States*, 41 CIT __, __, 211 F. Supp. 3d 1365, 1374 (2017), *aff'd sub nom. WWRD US, LLC v. United States*, 886 F.3d 1228 (Fed. Cir. 2018).

a heading shall be determined according to the terms of those subheadings and any

related subheading notes and, *mutatis mutandis*, to the above [GRIs] on the

understanding that only subheadings at the same level are comparable." GRI 6,

HTSUS; *see also WWRD US, LLC*, 886 F.3d at 1232. For purposes of GRI 6, "the

relative section, chapter, and subchapter notes also apply, unless the context otherwise

requires." GRI 6, HTSUS.

The court considers chapter and section notes of the HTSUS in resolving

classification disputes because they are statutory law, not interpretive rules. *See Arko*

*Foods Int'l, Inc. v. United States*, 654 F.3d 1361, 1364 (Fed. Cir. 2011) (citations

omitted); *see also Park B. Smith, Ltd. v. United States*, 347 F.3d 922, 929 n.3 (Fed. Cir.

2003) (chapter and section notes are binding on the court). "Absent contrary legislative

intent, HTSUS terms are to be 'construed [according] to their common and popular

meaning.'" *Baxter Healthcare Corp. of Puerto Rico v. United States*, 182 F.3d 1333,

1337 (Fed. Cir. 1999) (quoting *Marubeni Am. Corp. v. United States*, 35 F.3d 530, 533

(Fed. Cir. 1994)). Courts may rely upon their own understanding of terms or consult

dictionaries, encyclopedias, scientific authorities, and other reliable information.

*Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed. Cir. 1988); *BASF*

*Corp. v. United States*, 35 CIT ___, ___, 798 F. Supp. 2d 1353, 1357 (2011).

## II.     Analysis of the Terms of HTSUS 9817.00.96

The court must first ascertain the proper meaning and scope of HTSUS

9817.00.96. *See Bausch*, 148 F.3d at 1365. Congress passed the Educational,

Scientific, and Cultural Materials Importation Act of 1982, Pub. L. No. 97-446, 96 Stat.

2329, 2346 (1983), and the Omnibus Trade and Competitiveness Act of 1988, Pub. L.

No. 100-418, 102 Stat. 1107 (1988), to implement the Nairobi Protocol to the Florence

Agreement on the Importation of Educational, Scientific and Cultural Materials ("Nairobi

Protocol"), an international agreement intended to provide "duty free treatment to

articles for the use or benefit of the physically or mentally handicapped persons, in

addition to articles for the blind."  *See U.S. Customs Serv. Implementation of the Duty-*

*Free Provisions of the Nairobi Protocol, Annex E, to the Florence Agreement*, T.D. 92-

77, 26 Cust. B. & Dec. 240, 241 (1992) ("*Customs' Implementation of the Nairobi*

*Protocol*").[14]   This legislation eliminated duties for products covered by subheading

9817.00.96 of the HTSUS, which includes: "Articles specially designed or adapted for

the use or benefit of the blind or other physically or mentally handicapped persons;

parts and accessories (except parts and accessories of braces and artificial limb

prosthetics) that are specially designed or adapted for use in the foregoing articles . . .

Other."[15]   Subheading 9817.00.96, HTSUS; *see also Sigvaris, Inc. v. United States*, 41

---

[14] The Nairobi Protocol, "which went into effect on January 2, 1982, 1259 U.N.T.S. 2, broadened the scope of the Florence Agreement on the Importation of Educational, Scientific and Cultural Materials, opened for signature November 22, 1950, T.I.A.S. No. 6129, 17 U.S.T. 1835, 131 U.N.T.S. 25, by embracing technologically-new articles and previously-uncovered works of art, films," and other articles that would  benefit the physically or mentally handicapped persons, in addition to the blind. *Starkey Labs., Inc. v. United States*, 22 CIT 360, 361 n.1, 6 F. Supp. 2d 910, 911 n.1 (1998), *adhered to on recons.,* 24 CIT 504, 110 F. Supp. 2d 945 (2000) (emphasis removed); *Customs' Implementation of the Nairobi Protocol*, 26 Cust. B. & Dec. at 241.

[15] Pursuant to Note 1 to Chapter 98, subheading 9817.00.96 "[is] not subject to the rule of relative specificity in [GRI] 3(a).  Any article which is described in any provision in this chapter is classifiable in said provision if the conditions and requirements thereof and of any applicable regulations are met."  Note 1, Chapter 98, HTSUS.

CIT ___, 227 F. Supp. 3d 1327, 1335 (2017).  Subheading 9817.00.96 excludes "(i) articles for acute or transient disability; (ii) spectacles, dentures, and cosmetic articles for individuals not substantially disabled; (iii) therapeutic and diagnostic articles; or (iv) medicine or drugs."  U.S. Note 4(b), Subchapter XVII, Chapter 98, HTSUS.

As the language of this provision indicates, classification within subheading 9817.00.96 depends on whether the article in question is "specially designed or adapted for the use or benefit of the blind or physically and mentally handicapped persons," and whether it falls within any of the enumerated exclusions.  *See* subheading 9817.00.96, HTSUS; U.S. Note 4(b), Subchapter XVII, Chapter 98, HTSUS.  Note 4(a) to Chapter 98 provides that the term "'physically or mentally handicapped persons' includes any person suffering from a permanent or chronic physical or mental impairment which substantially limits one or more major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working."  U.S. Note 4(a), Subchapter XVII, Chapter 98, HTSUS.  This list of exemplar activities indicates that the term "handicapped persons" is to be liberally construed so as to encompass a wide range of conditions, provided the condition substantially interferes with a person's ability to perform an essential daily task.[16]  *See Sigvaris,* 227 F. Supp. 3d at 1335.  While the HTSUS and subchapter notes do not provide a proper definition of "substantial" limitation, "the inclusion of the word 'substantially' denotes that the

---

[16] Common sense dictates, and no party questions, that using the toilet constitutes an essential daily task.

limitation must be 'considerable in amount' or 'to a large degree.'" *Id.* at 1335 (citing

Webster's at 2280).

The HTSUS does not establish a clear definition of what constitutes "specially

designed or adapted for the use or benefit" of handicapped persons.  In the absence of

a clear definition, the court may rely upon its own understanding of the terms or consult

dictionaries and other reliable information.  *Brookside Veneers*, 847 F.2d at 789; *BASF

Corp.*, 798 F. Supp. 2d at 1357.  In analyzing this same provision in *Sigvaris*, the court

construed these operative words as follows:

> The term "specially" is synonymous with "particularly," which is defined as
> "to an extent greater than in other cases or towards others."  [Webster's]
> at 1647, 2186 . . . The dictionary definition for "designed" is something that
> is "done, performed, or made with purpose and intent often despite an
> appearance of being accidental, spontaneous, or natural."  [Webster's] at
> 612 . . . .

227 F. Supp. 3d at 1336.  The legislative history further informs the court's analysis of

these terms as used in subheading 9817.00.96, HTSUS.  The legislative history of this

subheading indicates that Congress did "not intend that an insignificant adaptation

would result in duty-free treatment for an entire relatively expensive article."  S. Rep.

No. 97-564, at 19 (1982).  Rather, "the modification or adaptation must be significant so

as to clearly render the article for use by handicapped persons."  *Id*.   Fundamentally,

this court "interpret[s] statutory language to carry out legislative intent."  *Rubies

Costume, Co. v. United States*, 337 F.3d1350, 1357 (Fed. Cir. 2003) (citing *Nippon

Kogaku (USA), Inc. v. United State*s, 69 C.C.P.A. 89, 673 F.2d 380, 383 (1982)); *see

also EOS of N. Am., Inc. v. United States*, 37 CIT ___, ___, 911 F. Supp. 2d 1311, 1318

(2013).  The court's interpretation of the terms "specially" and "designed" in *Sigvaris*

comports with the legislative intent behind subheading 9817.00.96, HTSUS, that any

modification or adaptation be "significant."  Accordingly, "articles specially designed for

handicapped persons must be made with the specific purpose and intent to be used by

or benefit handicapped persons rather than the general public."   *Sigvaris,* 227 F. Supp.

3d at 1336 (citing *Marubeni Am. Corp.*, 35 F.3d at 534 ("construing a provision with

similar language that covered 'motor vehicles principally designed for the transport of

persons'")).  Any adaptation or modification to an article to render it for use or benefit by

handicapped persons must be significant.

Customs has recognized several factors to be utilized and weighed against each

other on a case-by-case basis when determining whether a particular product is

"specially designed or adapted" for the benefit or use of handicapped persons.  *See*

*Customs' Implementation of the Nairobi Protocol,* 26 Cust. Bull. & Dec. at 243-244.

Those factors include: the physical properties of the product in question; "the probability

of general public use"; the specific design of the particular product; and whether the

product is sold in specialty stores that serve handicapped persons.  *Id.*

### III.    Classification of the Subject Merchandise

#### a.  Parties' Contentions

At the outset, Defendant does not contend that the merchandise falls within any

of the enumerated exceptions to subheading 9817.00.96.  *See* U.S. Note 4(b),

Subchapter XVII, Chapter 98, HTSUS.  According to Plaintiff, Danze specially designed

the subject merchandise to meet the relevant minimum standards established by the

U.S. Department of Justice ("DOJ") for ADA compliance,[17] and prominently advertises

the merchandise as ADA compliant; therefore, it is "easy to conclude that the subject

toilets are 'specially designed' for the use or benefit of handicapped persons."  Pl.'s

Mem. at 4-5.  Specifically, the relevant DOJ Standards set forth the following

requirements:

> § 604.4 Seats. The seat height of a water closet above the finish floor
> shall be 17 inches (430mm) minimum and 19 inches (485 mm) maximum
> measured to the top of the seat. Seats shall not be sprung to return to a
> lifted position.
>
> § 604.6 Flush Controls. Flush controls shall be hand operated or
> automatic. Hand operated flush controls shall comply with 309. Flush
> controls shall be located on the open side of the water closet except in
> ambulatory accessible compartments complying with 604.8.2.
>
> § 309.4 Operation. Operable parts shall be operable with one hand and
> shall not require tight grasping, pinching, or twisting of the wrist. The force
> required to activate operable parts shall be 5 pounds (22.2 N) maximum.[18]

*Id.* at 9-10; 2010 Standards at Bates 126, 164, 165.  Danze acknowledges that its toilets

measure 16 1/2 inches from the floor to the rim, but contends that when the toilet seat is

installed, the distance from the floor to the seat is at least 17 inches.  Pl.'s Mem. at 10.

In the alternative, Danze argues that even without the 2010 Standards, its toilets would

---

[17] In September 2010, the DOJ published ADA Standards for Accessible Design to
provide minimum scoping and technical requirements for newly designed and
constructed or altered government facilities, public accommodations, and commercial
facilities so that individuals with disabilities can access and use those facilities.  Pl.'s Ex.
B. (2010 ADA Standards for Accessible Design) ("2010 Standards") at Bates 046, ECF
No. 36-2.

[18] The 2010 Standard define an operable part as "[a] component of an element used to
insert or withdraw objects, or to activate, deactivate, or adjust the element."  Pl.'s Mem.
at 10 n.13; 2010 Standards at Bates 070.

merit duty-free treatment because their height is greater than a standard toilet, which

measures 14 to 15 inches.  Pl.'s Mem. at 11 & n.16 (citing Pl.'s Ex. G-1 (HQ 055815

(May 26, 2010), ECF No. 36-8); *see also* Resp. of Danze, Inc. in Opp'n to Def.'s Cross-

Mot. for Summ. J. and Reply in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Reply") at 7, ECF

No. 44 ("Whenever an ADA compliant product differs in design from its non-ADA

compliant counterpart, the product is *ipso facto* 'specially' designed.").

        According to Danze, HTSUS subheading 9817.00.96 "is meant to be a low

threshold" and the requirement that the product be "specially designed" for use or

benefit of handicapped persons "is not an especially exacting requirement."  *Id.* at 15.

Danze asserts that the subject toilets meet the low threshold of subheading 9817.00.96

because

> they are designed for and capable of use by persons suffering from all
> manner of permanent and chronic impairments which may impair their
> mobility, confined them to a wheelchair, or make it difficult for them to
> lower themselves to, or raise themselves from, a regular height toilet.
> These could include paralysis, poliomyelitis, arthritis, and atrophy resulting
> from old age or disease.

*Id.*  Danze relies on Customs Ruling HQ H055815 as an acknowledgment by Customs

"that taller-than-average toilets are specially designed for the use or benefit of persons

suffering from mobility handicaps, and qualify for secondary classification under

subheading 9817.00.96, HTSUS."  Pl.'s Reply at 2-4; *see also* Pl.'s Mem. at 10, 11-12,

17-18.

        The Government does not dispute that the toilets, "if installed correctly and

equipped with a seat of 1/2 inch in height would minimally meet ADA seat height

requirements."  Def.'s Reply Mem. in Supp. of its Cross-Mot. for Summ. J. ("Def.'s

Reply") at 2, ECF No. 45.  The Government maintains, however, that mere compliance

with ADA standards does not render a good classifiable under subheading 9817.00.96.

Def.'s Mem. at 6.  It asserts that Danze has not designed the subject merchandise with

any significant modification or adaptation so "as to clearly render the articles for the use

or benefit of physically handicapped persons," nor does it market or sell them "in a

manner that suggests they have been 'specially designed'" for that purpose.  *Id.*

According to Defendant, the evidence submitted by Plaintiff establishes that products

were designed "to fill a general need for a more compact toilet featuring an elongated

bowl in urban areas where space was at a premium and bathrooms were small," and

advertised as ADA compliant and ergonomically comfortable "for any age group," and

"universally designed."  Def.'s Reply at 7.[19]  Defendant asserts that Plaintiff has failed to

provide any authority or legislative history to Chapter 98, HTSUS, that identifies any

relationship between ADA compliance and subheading 9817.00.96.  Def.'s Mem. at 20-

21.

---

[19] The Government cites the Center for Inclusive Design and Environmental Access for
the definitions of universal and accessible design:

> Universal design means products and buildings are accessible and usable
> by everyone, including people with disabilities. . . . Accessible design has
> a tendency to lead to separate facilities for people with disabilities, for
> example, a ramp set off to the side of a stairway at an entrance or a
> wheelchair accessible toilet stall. Universal design, on the other hand,
> provides one solution that can accommodate people with disabilities as
> well as the rest of the population.

Def.'s Reply at 7 n.4 (citation omitted).

###### b.  Analysis

The question for the court is whether the merchandise at issue, toilets designed and meeting ADA standards, qualify for duty-free treatment pursuant to HTSUS 9817.00.96.  There is no genuine dispute as to the material facts – the toilets, with a seat installed, measure at least 17 inches from the floor to the top of the seat and meet the other relevant ADA standards.  Nevertheless, for the reasons discussed below, the court finds that the subject toilets and toilet tank have not been "specially designed for the use or benefit of handicapped persons" and do not qualify for duty-free treatment pursuant to HTSUS 9817.00.17.

The court has considered a number of factors in making its determination, including the physical properties of the merchandise, whether the merchandise is solely used by the handicapped, the likelihood the merchandise is useful to the general public, and the specific design of the merchandise.  *See Customs' Implementation of the Nairobi Protocol,* 26 Cust. Bull. & Dec. at 243-244.  Each toilet has a rim height of at least 16 1/2 inches from the floor, Pl.'s SOF ¶¶ 14-15; Def.'s Resp. to Pl.'s SOF ¶¶ 14-15, which increases to at least 17 inches when the seat is installed, *see* Pl.'s SOF ¶¶ 51, 55; Def.'s Resp. to Pl.'s SOF ¶¶ 51, 55; Pl.'s Ex. H at 86:18-87:18; Pl.'s Ex. D ¶¶ 7-8, 10, 13 & Exs. A-C.  An article from Consumer Reports suggests that toilets taller than standard toilets, referred to as "comfort toilets," and measuring 17 to 19 inches high to the seat top, "have become the most common choice."  Def.'s Ex. 4 (Sept. 2016 Consumer Report, "Toilet Buying Guide") at 3, ECF No. 39-2.   Indeed, all of the toilets that Danze markets have a minimum measurement of 16 1/2 inches from the finished

floor to the bowl rim, Def.'s SOF ¶ 14; Pl.'s Resp. to Def.'s SOF ¶ 14, and Danze

markets them as, "ergonomically designed at a level that makes sitting and standing

more comfortable for any age group," Pl. Ex. E-1 at Bates 515.  This suggests that the

toilets were intended for the general public and not specifically for the benefit or use of

handicapped persons.

The flush controls for the toilets and toilet tank indicate that flushing is

accomplished in a manner that appears common in many standard toilets.  The flush

control connects to a lever arm on the inside of the tank, which is attached by a thin

chain to a three-inch round rubber flapper valve at the bottom of the tank.  Def.'s SOF

¶ 17; Pl.'s Resp. to Def.'s SOF ¶ 17.  Diagrams for each of the toilets and the toilet tank

depict that the pressing of the flush control raises the lever arm inside the tank, which in

turn, raises the rubber flapper, releasing the water from the tank into the toilet bowl.

Pl.'s Ex. C-1—C-5 at Bates 238, 260, 286, 306, 328.  The flush control is positioned on

the left side of the tank, less than 36 inches above the finished floor, and is operable by

one hand with force not exceeding five pounds.  Pl.'s SOF ¶¶ 23-25, 27; Def.'s Resp. to

Pl.'s SOF ¶¶ 23-25, 27.  Although Danze maintains that the flush handle is ADA

compliant because it requires no more than five pounds to operate and is not positioned

higher than 36 inches from the floor, *see* Pl.'s Mem. at 3, 5, 9-10, Danze has not

suggested that these features distinguish the subject merchandise from standard toilets.

Each toilet has an elongated bowl and is ergonomically designed to make sitting

and standing more comfortable for any user.  Pl.'s Exs. C-1—C-5 at Bates 235, 257,

283, 303; Pl.'s Ex. E-1 at Bates 515; *see also* Def.'s SOF ¶ 21; Pl.'s Resp. to Def.'s

SOF ¶ 21.  Danze's product catalog advertises the ergonomic features of its toilets as

follows: "Ergonomics aren't just for luxury cars. We apply them to the most important

seat in the house. That's why our toilets make sitting and standing easier than ever."

Pl.'s Ex. E-1 at Bates 433.[20]  The same laws of physics that led to the adoption of a 17-

19 inch height standard for the ADA also make these higher toilets easier to use for

much of the population at large.  The higher seat alters the angle of the knees such that

less force is required to lower oneself onto or rise off of the toilet, *see* HQ Ruling

H055815, whether the user is transferring to a wheelchair or simply standing up.

Although the toilets feature an elongated bowl, which typically takes more space

in the bathroom, they have a more compact overall footprint.  Def.'s SOF ¶ 11; Pl.'s

Resp. to Def.'s SOF ¶ 11.  Danze's internal memorandum states that the company's

decision to develop a line of high efficiency compact elongated toilets arose from "[t]he

demands . . . from geographic areas where the bathrooms are typically small.  Pl.'s Ex.

F-1 at Bates 667; Pl.'s Ex. H at 99.  While this same memorandum specifies that the

products must be ADA-compliant, the memorandum does not indicate the degree of

modification or adaptation, if any, that was required to ensure compliance with ADA

standards, let alone suggest that the modification or adaptation was "significant."  Pl.'s

Ex. F-1 at 668.

---

[20] Moreover, each toilet fits a 12-inch residential rough-in sewer line opening.  Pl.'s Exs.
C-1—C-5 at Bates 235, 257, 283, and 303.  "A rough-in distance" is "the distance from
the finished wall to the center of the sewer drain for the toilet."  Def.'s Ex. 2 (HGTV.com
Web-Article titled "Choose The Right Toilet For Your Bathroom") at 2, ECF No. 39-2.  A
measurement of 12 inches is standard "and the widest selection of toilets is available in
this size." *Id.*

Danze asserts that "[a] toilet can be designed for ADA compliance and for general comfort without frustrating the scope of subheading 9817.00.96." Pl.'s Reply at 16. However, the fact that Danze ensured its toilets comply with ADA standards, alone, is not sufficient to include its toilets within subheading 9817.00.96. Congress passed the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The ADA prohibits discrimination against individuals with disabilities in the sectors of employment, public services, public accommodations, and other sectors of society. *See generally ADA.* Congress intended that the ADA be construed broadly.[21] While the court is mindful that the ADA is to be construed broadly in favor of individuals seeking protection under that law, this is not the issue before the court. The issue before the court is whether the subject merchandise is entitled to duty-free treatment simply because it is ADA compliant. In this case, it would appear that the same dimensional standards that address a physical barrier to the physically handicapped—higher toilet seats—are also appreciated by the public at large, such that they have become "the most common choice." Def.'s Ex. 4 at 3. Nothing in the language of the subheading, corresponding tariff notes, or its legislative history indicates that subheading 9817.00.96, HTSUS is to

---

[21] This is confirmed by Congress' passage of the ADA Amendments Act of 2008, Pub. L. 110-325, 122 Stat. 3553 (2008), effective January 1, 2009, to abrogate certain U.S. Supreme Court precedent that improperly narrowed the scope of protection originally intended by Congress, and ensure that "[t]he definition of disability … be construed in favor of broad coverage of individuals under [the ADA]." *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1110 (8th Cir. 2016) (citing 42 U.S.C. § 12102(4)(A); 29 C.F.R. Pt. 1630, App'x § 1630.1(c)).

be construed to provide duty-free treatment for an otherwise mass market product

merely because it also meets the standards adopted to prevent discrimination against

the physically handicapped.[22]

Plaintiff's reference to HQ Ruling H055815 does not persuade the court that a

different outcome is warranted.  In Ruling H055815, Customs determined that toilets

measuring 17 inches from the floor to the top of the bowl rim qualified for duty-free

treatment pursuant to subheading 9817.00.96, HTSUS while another toilet measuring

16 1/2 inches from floor to rim did not.  Pl.'s Ex. G-1.  In its analysis, Customs found it

"unlikely that toilets that measure 17 inches from the floor to the top of the bowl rim

would be acquired other than for the benefit or use of a handicapped individual who is

likely to benefit when transferring from the wheelchair to the toilet."  *Id.* at Bates 711.

This statement, however, was unsupported by any citation and is contradicted by the

---

[22] Plaintiff cites certain classification rulings pertaining to articles that meet ADA standards in which Customs determined the articles in question qualify for duty-free treatment pursuant to subheading 9817.00.96, HTSUS.  Pl.'s Mem. at 16-17.  However, none of the cited rulings establish that mere compliance with ADA standards warrants duty-free treatment.  For example, in Ruling N052323, safety bars that mount to wall studs, used predominantly in the bathroom, supporting a maximum weight of 500 pounds, and meeting ADA standards were determined to be different from ordinary bathroom towel racks because of the weight they could support and were determined to be specially designed or adapted for the use or benefit of the physically or mentally handicapped.  Pl.'s Ex. G-2 (NYRL N052323 (March 3, 2009)), ECF No. 36-8.  Customs made similar findings in Ruling N052324 regarding safety bars and shower seats meeting ADA standards.  Pl.'s Ex. G-3 (NYRL N052324 (March 3, 2009)), ECF No. 36-8.  With respect to the shower seat, Customs considered their design and determined that "the fact that they are mounted to the wall helps to distinguish them from items for those with temporary disabilities or who just prefer to shower while seated."  *Id.*

evidence here.  Moreover, Customs did not discuss the design issues addressed here

and the correctness of HQ Ruling H055815 is not before the court.

Plaintiff does not address any of the factors cited by Customs, nor point to any

evidence other than its ADA compliance to support its assertions that the products were

specially designed for handicapped persons.  In its reply, Danze seeks to clarify that it

"does not contend that compliance [] ADA standard[s] *per se* deems the article eligible

for duty-free treatment under subheading 9817.00.96, HTSUS."  Pl.'s Reply at 6

(emphasis omitted).  It states that "*if it can be shown that the article is specially*

*designed or adapted*, compliance with the [2010 Standards] constitutes powerful

evidence that the 'specially designed or adapted' requirement necessary for Nairobi

classification has been shown."  *Id.* at 6-7 (emphasis added).  Nevertheless, the only

evidence that Plaintiff provides as proof that the subject merchandise was specially

designed for the use or benefit of the handicapped is the merchandise's compliance

with the 2010 Standards.  *See id.* at 7-8 ("Plaintiff submits that meeting the [2010

Standards] water closet requirements evidences that instant goods are designed to

benefit handicapped persons.") (emphasis omitted); *id.* at 10 ("[T]he goods were

admittedly designed to meet the [2010 Standards].");  *id.* at 14 ("Because the designs

are admittedly 'taller than standard toilets,' it must also be true that the toilets are

'specially designed for the use or benefit of' physically handicapped persons.") (internal

citation omitted).  This is insufficient to qualify the merchandise for classification in

subheading 9817.00.96, HTSUS.[23]

### CONCLUSION

For the foregoing reasons, the court holds that Customs correctly classified the

subject imports. The court denies Plaintiff's motion for summary judgment and grants

Defendant's cross-motion for summary judgment. Judgment will be entered accordingly.


/s/       Mark A. Barnett
Mark A. Barnett, Judge

Dated: June 19, 2018
        New York, New York

---

[23] Plaintiff makes the assertion that courts have "*never*, until now, rejected an importer's claim to preferential treatment under the Nairobi Protocol" and cites four cases as support.  Pl.'s Mem. at 15 (emphasis in original).  Each of the cited cases is distinguishable and did not concern the legal issue in the present case.  *In Starkey Labs*, 22 CIT 360, 360-61, 6 F. Supp. 2d 910, 910-11, the parties had stipulated that the merchandise in question, hearing aid components, was specifically designed or adapted for the use or benefit of persons suffering from a physical handicap. The sole issue was whether the components were "parts" that could not be categorized as articles.  *Id.* at 362-63, 912-13.  The remaining cases concerned the issue of whether the articles in question were "therapeutic" articles, and, therefore, excepted from duty-free treatment.  *See Richards Med. Co. v. United States*, 13 CIT 519, 520, 720 F. Supp. 998, 1000 (1989), aff'd, 910 F.2d 828 (Fed. Cir. 1990); *Travenol Labs., Inc. v. United States*, 17 CIT 69, 73-74, 813 F. Supp. 840, 844 (1993); *Nobelpharma U.S.A. Inc. v. United States*, 21 CIT 47, 56, 955 F. Supp. 1491, 1499 (1997) (also considering whether the loss of natural teeth (edentulism) renders persons physically or mentally handicapped).